## UNITED STATES

v.

**Lionel S. GLOVER, Jr., 422 84 9294, Lance Corporal (E–3), U.S. Marine Corps.**

**NMCM 90 2595.**

U.S. Navy–Marine Corps Court of Military Review.

Sentence Adjudged 1 May 1990.

Decided 9 July 1991.

Lt P. Van Hartesveldt, JAGC, USNR, Appellate Defense Counsel.

Capt Dwight H. Sullivan, USMC, Appellate Defense Counsel.

LCDR James G. Weinmeyer, JAGC, USNR-R, Appellate Government Counsel.

Maj Thomas D. Miller, USMC, Appellate Government Counsel.

Before WILLEVER, C.J., STRICKLAND, Senior Judge, and ORR, J.

ORR, Judge:

Contrary to his pleas, the appellant was convicted by a military judge sitting alone of missing movement by design, two specifications of disobeying orders, and malingering in violation, respectively, of Articles 87, 91, and 115, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 887, 891, and 915. He was sentenced to confinement for 3 months, forfeiture of $300.00 pay per month for 3 months, reduction to pay grade E–1, and a bad-conduct discharge. The convening authority, however, disapproved the findings of guilty as to the two order violations, reassessed the sentence by reducing the forfeitures to $200.00 pay per month for 3 months, and otherwise approved the remaining findings and sentence.

The appellant argues as the one assignment of error that the Government failed to prove his guilt of the malingering charge. The malingering specification alleged that the appellant "did ... from about 20 July 1989 and at all times thereafter for the purpose of avoiding assigned duties, field exercises and/or service as an enlisted member feign a sore foot." The evidence offered by the Government showed that the appellant suffered a foot injury playing for his unit's football team in August 1988. An x-ray of the foot showed chip fractures at the top of the arch of his right foot. Treatment was undertaken at the Battalion Aid Station, a branch of the local Naval Hospital, for several months with physical therapy at the hospital. During this time the appellant reported that he had dropped a weight on the top of the same foot several weeks before the football injury but had not sought medical care for that earlier injury.

When the appellant continued to experience pain in his right foot, he was referred to the podiatry clinic at the hospital where he was examined in December 1989 by a board-certified podiatrist with over 7 years

experience in podiatry (entirely with the Marine Corps) as well as 5 years of medical training in podiatry. This doctor prescribed several courses of action to address the continuing pain and discomfort complained of by the appellant, but a month later, the appellant returned to the clinic with essentially the same complaints. The doctor noted swelling over the arch, muscle weakness in the foot, and obvious chip fractures still evident in new x-rays. The doctor ordered a bone scan of the foot and a 6-month limited duty medical board. On 20 January 1989 the board recommended that the appellant be placed on limited duty for 6 months and be precluded from field work, running, or marching, and have monthly follow-up examinations.

Although the medical board did not have the results of the bone scan at the time it made its recommendations, the podiatrist testified that the scan showed "quite an increased uptake" of the radioactive dye at the medial cuneiform tarsal bone of the right foot. Record at 170; Prosecution Exhibit 1, page 11. These bones constitute the "keystone" of the arch and support the weight of the body when standing or walking. She concluded that the increase was "certainly consistent with more than just the small flakes that we saw on the routine x-ray." Record at 170.

Following an examination on 8 March 1989, the podiatrist handwrote a memo concerning the appellant's injury with the following notations:

1. This member was thoroughly re-examined today & it was decided by this staff that the damage that was done to his foot has resulted in "traumatic arthritis of his cuneiform joints."

2. This man's rehabilitation & improvement is going to be difficult at best. It is important that he not do any further damage to his foot which is likely to happen in a field environment.

....

4. He is not to run, hike, march, hump or be in the field until his 6 mo. Board expires....

Prosecution Exhibit 1, pages 16–17.

The appellant's monthly exams for April, May, June, and July indicate some improve-

ment, but the podiatrist who saw the appellant at the July exam was not the podiatrist who had seen the appellant previously and no recommendation was made concerning the appellant or his injury after the limited duty period expired on 20 July. On 11 August the podiatrist who testified at trial and who had followed the appellant's injury since December sent a pre-printed form memo (Prosecution Exhibit 1, page 24) to the "Area Medical Clinic Medical Officer, Battalion Surgeon, or Commanding Officer" concerning the appellant's injury and stating, in part: "The patient's physical findings ... are not abnormal enough to justify any disposition other than Return to Full Duty...." The podiatrist hand-wrote the following notation at the bottom of the form:

He has arthritis in his foot from his previous injury. It has improved as much as can be expected. There is no surgery for this problem. If he can't do the USMC requirements, he can be evaluated by the Central Physical Evaluation Board for a discharge (as above in paragraph 3).

Paragraph 3 of the pre-printed form states:

If the active duty member is not able to satisfactorily perform the assigned military duties due to the musculoskeletal problem, and his military commander desires appearance before a medical board for evaluation, then please include with your return-visit request for consultation a letter from the member's commanding Officer indicating the member's performance deficiency and the request for a formal medical board evaluation.

On 15 August 1989, the podiatrist noted in the appellant's health record that the appellant had received the maximum benefit of what was available at the hospital. In addition, the entry stated that the clinic had expected that the appellant would return to full duty after the 6-month period of prolonged rest, that the appellant was diagnosed with traumatic degenerative joint disease in the second metetarsal cuneiform joint of the right foot, that no further conservative care was available,

that the appellant was not a candidate for surgery, and that the appellant was returned to full duty with instructions as outlined in paragraph 3 of the 11 August memo.

On 28 August 1989, the appellant sent a memo (Prosecution Exhibit 2, page 6) to his company commander stating that he was continuing to experience problems with his right foot that prevented him from any prolonged standing, marching, running, jumping or participating in physical training. He also stated that field work caused "unbearable pain" from the rough and uneven terrain, and he implicitly requested a medical discharge. On 13 September 1989, the appellant's company commander wrote a letter to the battalion medical officer via the battalion commanding officer requesting that the appellant be evaluated by a medical board for further service. At about the same time, the appellant was transferred from the supply company he had been in to another company within the battalion.

For reasons unknown, the battalion medical officer did not act on the 13 September request until 23 October 1989, just 6 days before the appellant was supposed to deploy with his company on field exercises for several weeks in the desert. The medical officer, who was not qualified as an expert in podiatry and did not have specialized training in the diagnosis or treatment of foot injuries, told the appellant he was having difficulty believing the appellant was still having problems a year after the injury had occurred. Record at 80. Nevertheless, the medical officer wrote a consult referring the appellant back to the podiatry clinic at the Naval Hospital with an appointment for 6 November and sent a memo to the appellant's new company clearing the appellant to participate in the field exercise with certain limitations: no prolonged standing for more than 20 minutes, no marching or carrying a pack, and no lifting more than 30 pounds. The medical officer testified that he spoke to the podiatrist who had been following the appellant before he wrote the clearance, Record at 80–81, but the podiatrist testified

she had no recollection of such a conversation. Record at 190.

After the appellant was seen at the hospital on 6 November 1989, a medical board on 8 November 1989 recommended referring the appellant's case to a Physical Evaluation Board (PEB) with a diagnosis of traumatic degenerative joint disease of the medial-intermediate cuneiform joint of the appellant's right foot and expressed the opinion that the appellant was unable to perform full duty. The PEB results, if any, are not reflected in the record of trial.

Although conceding that the appellant had a foot injury, the Government argues that "[t]he evidence shows that the appellant shirked various military duties he should have been capable of performing even with an injured foot." Critical to this position, however, is the failure of the specification to describe such a theory. The appellant was convicted of feigning a sore foot, not that he exaggerated the seriousness of a sore foot. Nevertheless, even if we overcome this hurdle in the Government's argument, we are not convinced that the appellant was faking or exaggerating any aspect of his injury. We are mindful that the podiatrist testified, in response to questions from the military judge, that because the appellant had shown improvement in the months before the 6–month limited duty period expired, she thought he could return to full duty so she did not extend the period or initiate a medical discharge board at that time. However, she testified further:

> It was clear that he was not normal, but that he had a condition that had improved to the point that we could expect no more at this time and that he had a condition *that perhaps could be tolerable* under the full-duty requirements of the Marine Corps and that *he should go out and attempt to do those things.* The memorandum in August explained that if that attempt was not—*if he was unable to do that, then the process was laid out what needed to be done next.*

Record at 189–190 (emphasis added). The military judge then inquired further whether the podiatrist saw any other limitation

besides the pain the appellant might have expressed that would have prevented the appellant from performing normal military duties in the months following the expiration of the limited duty period. The doctor replied that the type of arthritis that the appellant had "could be rather symptomatic or not much symptomatic" and "[t]here is nothing particular that would limit his activities." Record at 190. The doctor had testified earlier, however, that there probably were some degenerative or arthritic changes in the joints of appellant's right foot and that such changes "classically wax and wane and improve and get worse." Record at 171. We take this testimony to mean that there was no risk of the appellant's foot collapsing while running, jumping or marching and that the appellant could do as much as any pain he experienced could be tolerated.

There was no evidence offered by the Government that the appellant did not suffer pain as a result of the injury. There was evidence offered that at times the appellant was observed walking without a noticeable limp, but that evidence is entirely consistent with the appellant's medical history and the testimony of the podiatrist that the appellant had good days and bad days—which is a common characteristic of arthritis. One of the essential elements of the offense of malingering is that "the accused feigned illness, physical disablement, mental lapse or derangement, or intentionally inflicted injury upon himself or herself...." Manual for Courts–Martial, United States, 1984 (MCM), para. 40b(2). In further explanation of the offense, the MCM provides:

> The essence of this offense is the design to avoid performance of any work, duty, or service which may properly or normally be expected of one in the military service. Whether to avoid all duty, or only a particular job, it is the purpose to shirk which characterizes this offense. Hence, *the nature or permanency of a self-inflicted injury is not material on the question of guilt, nor is the seriousness of a physical ... disability which is a sham.* Evidence of the extent of the ... feigned disability may, however, be relevant as a factor indicating the presence or absence of the purpose.

MCM, para. 40c (emphasis added). The converse of the underlined portion of the explanation is that the seriousness of a physical disability that is *not* a sham would be material on the question of guilt. The Government's own medical expert and the Navy's medical board certainly thought the appellant's injury was serious, disabling, and service disqualifying. But for the podiatrist's willingness to have the appellant attempt to return to full duty, the appellant would have been considered for a medical discharge at the conclusion of the limited duty period. Given the medical diagnosis, the nature of the expert's approach to the appellant's possible recovery (that the appellant should try to do as much as he could), and her well-intended motive (to return the appellant to full duty), we do not believe under these particular circumstances that we should sit as arbiters of how *much* pain or discomfort the appellant should endure before he is either considered to have committed a crime or not committed a crime. In this case, we are not convinced beyond a reasonable doubt of the appellant's guilt. Article 66(c), UCMJ, 10 U.S.C. § 866(c).

A second essential element of this offense is that in feigning illness or disability, the accused must have the purpose or intention to avoid the work, duty, or service alleged. MCM, para. 40b(3). In the context of this case, the appellant's exaggeration of his injury or disability (if the offense had been appropriately charged in that language and we were convinced that he was exaggerating) must have been done with the purpose or intention of avoiding assigned duties, field exercises or service as an enlisted Marine. The appellant testified that his understanding of his medical status after coming off limited duty was that if there was anything he could not do or any task that he could not perform, he was to inform his commanding officer and, that after his August letter and his company commander's September letter, he thought he would be processed for a medical discharge. He also testified (and other

evidence supports this) that, during the two months he was still attached to supply after the limited duty period had ended, his company commander had the appellant stand assistant duty NCO watches to avoid further injury to his foot and that, when he was transferred to the H & S Company in September, he understood this was occurring because the company he was leaving needed someone who could deploy to the field. When he was subsequently told that he would have to deploy with the new company, he testified that, while he had been to the field numerous times before and the desert "can be fun," he was concerned about a permanent injury because of the rough desert terrain.

When the appellant was asked if he had tried to see the podiatrist after his 11 August examination, he replied:

> [T]here was no need for myself to see ... [the podiatrist] because, as she had stated before, everything that could had been done for myself, and I was only to follow her last instructions, which were if I couldn't do what I was instructed to do, I was to inform my unit, in which case I did that with a letter; and the last thing I received was a letter from my commanding officer that said he had requested for [sic] a CPEB board for me.

Record at 239.

The Government's evidence concerning the appellant's intentions during this period was essentially limited to individuals who either didn't actually know or were unsure what restrictions had been placed on the appellant's activities by superiors in his chain of command, lacked familiarity with or misunderstood the appellant's medical status,[1] or held opinions about the appellant's medical condition they were not qualified to make. The appellant's understanding and actions, on the other hand, were for the most part consistent with the testimony of the podiatrist who was handling his case. Consequently, we do not believe beyond a reasonable doubt that the appellant was feigning a sore foot for the

purpose of avoiding assigned duties, field exercises, and/or enlisted service in the Marine Corps.

Accordingly, the findings of guilty of the Additional Charge and its Specification are dismissed. The remaining findings of guilty are affirmed. Applying the principles of *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), we have reassessed the sentence and affirm only so much of the sentence as provides for confinement for 3 months, forfeiture of $200.00 pay per month for 3 months, and reduction to pay grade E–1.

Chief Judge WILLEVER and Senior Judge STRICKLAND concur.

---

1. The appellant's executive officer at the company he was transferred to in September 1989 testified from his recollection of the medical report "there was no sense in doing any more" for the appellant and competent authority couldn't "find a reason for his problem." Record at 52.